IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAN R. HILL, | CASE NO. CV F 08-00364 LJO WMW HC |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS WITH PREJUDICE; DIRECTING CLERK OF COURT TO ENTER JUDGMENT FOR RESPONDENT** |
| vs. | |
| KATHY MENDOZA-POWERS, | |
| Respondent. | |

On March 13, 2008, Jan R. Hill ("Petitioner"), a California prisoner currently proceeding with counsel, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition") in this Court[1] challenging the denial of parole in 2006.[2]

On May 27, 2008, Kathy Mendoza-Powers ("Respondent") filed a "Request for Stay Pending Issuance of the Mandate in *Hayward*." (Doc. 10.)[3] On July 2, 2008, Respondent filed an Answer to the

---

[1] At the time of filing the Petition, Petitioner was incarcerated at Avenal State Prison in Avenal, California. (Pet. 1.) Avenal is in Kings County, located within the jurisdictional boundaries of the United States District Court for the Eastern District of California. 28 U.S.C. § 84(b). The Petition is properly filed in this Court, located in the district that Petitioner was in custody at the time of filing the Petition. *See* 28 U.S.C. § 2241(d).

[2] Although petitions for habeas corpus relief are routinely referred to a Magistrate Judge, *see* L.R. 72-302, the Court exercises its discretion to address the Petition pursuant to Local Rule 72-302(d).

[3] On May 16, 2008, the Ninth Circuit Court of Appeals granted en banc review of *Hayward v. Marshall*, 512 F.3d 536 (9th Cir. 2008), and ordered that the opinion shall not be cited as precedent. *See Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).

1

Petition. (Doc. 13.) After initially granting Respondent's stay request, on September 16, 2008, the magistrate judge vacated the grant and denied Respondent's stay request, finding that ample precedent from the Ninth Circuit Court of Appeals bore on Petitioner's claim for relief. (Docs. 16, 20.) On October 14, 2008, Petitioner filed a Traverse to the Answer. (Doc. 22.) Thus, this matter is ready for decision.

## PROCEDURAL HISTORY

In 1987, a Los Angeles County Superior Court jury convicted Petitioner of first degree murder. (Pet. 1, 47.)[4] The superior court sentenced Petitioner to twenty-five years to life in state prison, and Petitioner began his term in 1987. (Pet. 1, 47.) The record states that Petitioner's "minimum eligible parole date" was December 18, 2003. (Pet. 47, 72, 145; Answer Ex. B at 2.)

On November 6, 2002, Petitioner was denied parole. (Pet. 145.) On October 12, 2006, the California Board of Parole Hearings ("Board") denied Petitioner parole for a second time, and stated it would review Petitioner's suitability again in two years. (Pet. 139, 143, 145.)

On April 19, 2007, Petitioner filed a habeas petition in the Los Angeles County Superior Court challenging the Board's denial of parole. (Answer Ex. A.) On October 4, 2007, the superior court denied the habeas petition in a reasoned opinion. (*Id.* Ex. B.) On October 31, 2007, Petitioner filed a habeas petition in the California Court of Appeal, which denied the petition on November 20, 2007, citing *In re Dannenberg*, 34 Cal. 4th 1061, 1071, 1080 (2005) and *In re Rosenkrantz*, 29 Cal. 4th 616, 664-65 (2002). (Answer Exs. C, D.) On December 5, 2007, Petitioner filed a petition for review in the California Supreme Court, which summarily denied the petition on February 13, 2008. (*Id.* Exs. E, F.)

On March 13, 2008, Petitioner filed his federal Petition in this Court.

## FACTUAL BACKGROUND[5]

> On the evening of August 30, 1985, Los Angeles County Deputy Sheriffs Steven Skahill and Joseph Hartslorne responded to a call and investigated the murder of Wayne

---

[4] For ease of reference, the Court utilizes the CM/ECF pagination from the Petition and from the Exhibits attached to Respondent's Answer.

[5] The Court adopts the factual background from the April 12, 1990, California Court of Appeal opinion on direct review of Petitioner's conviction as a fair and accurate summary of the evidence presented at trial. *See* 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002). The factual background from the court of appeal opinion was read into the record at the 2006 Board hearing and utilized by the Board in the denial of parole. (*See* Pet. 80-88.)

Daniels at the apartment of Rita Hill on Monument Canyon Road in Diamond Bar. While the deputies were at Hill's apartment, she came home, discovered what had occurred and became hysterical. The deputies found a trail of blood from the kitchen to the dining area and a trail of blood out to the garage where Daniels was found lying in the garage doorway. Daniels had been shot, once in the right cheek from a distance of between approximately three to eighteen inches, once in the back of the neck from a distance of greater than eighteen inches, and once in the back of the torso as if shot while he was lying on the ground. Blood was spattered on the walls and drapes of the apartment. The apartment had not been ransacked, and none of Hill's personal property had been taken.

Michael Sheerin lived in the apartment directly across from Hill's apartment. At approximately 10 p.m. on August 30, 1985, he heard what sounded like two shots, a pause, and then two more shots. Approximately 15 to 30 seconds after the shots, Sheerin opened his front door, which faced Hill's apartment. As Sheerin started to close his door, Hill's door opened. Sheerin observed [Petitioner], whose forward motion had stopped as he appeared "kind of frozen" while Sheerin finished closing his door. Sheerin observed [Petitioner's] profile for "half a second." Sheerin then looked through the peephole in his door and saw part of [Petitioner's] profile for "about" half a second as he was running away. Sheerin especially noticed what he described as [Petitioner's] "sunken eyes" and his "small mustache and small nose." He also gave the investigating deputies a description as to race, height, weight, age and hair length which matched [Petitioner's] physical description.

. . . .

Daniels had been Hill's boyfriend prior to her marriage to [Petitioner]. Hill and [Petitioner] were married from June of 1973 until their divorce in January of 1984, after which Hill became intimate friends with Daniels. In August of 1982, Hill and [Petitioner] had purchased a liquor store in Altadena. In April of 1985, the court granted Hill complete control over the store, which angered [Petitioner]. He wanted a share of the money the store was earning at that time. [Petitioner] threatened to beat Hill and to "come and put [her] out" and stated that he "wasn't going to need to kill" her to get her out of the store. On several occasions, [Petitioner] threatened to kill Hill and physically assaulted her three times between January of 1984 and January of 1985.

Daniels often helped Hill at the store. On one occasion, [Petitioner] came to the store when Daniels and his children were there. [Petitioner] cursed and screamed at Daniels and his children and threatened to beat him up if he did not get out of the store. [Petitioner] and Hill also had "fights" at some time "in the beginning" over Hill's "personal relationship" with Daniels.

In August of 1985, during a court proceeding to finally resolve ownership of the store, the court suggested that rather than going to trial, [Petitioner] should turn the store over to Hill. Apparently later some time in August, Hill decided to put the store in Chapter 11 bankruptcy reorganization as a result of large debts [Petitioner] had incurred during the time he had been in sole possession of the store. [Petitioner] was "angry" with Hill because of the bankruptcy proceedings.

On August 25, 1985, Hill noticed [Petitioner's] car following behind her car as she drove home from the store. Two days later, Hill and Daniels went to the Hollywood Bowl in the evening, and after Hill returned home late at night, [Petitioner] called her and threatened her again. On August 30, the day of the murder, Daniels came to the liquor store to get the key to Hill's apartment. They had arranged to meet at her apartment after Daniels visited a client and Hill returned late from the store.[6] When Hill returned home at approximately 10 p.m., she learned from the Sheriff's deputies present that Daniels

---

[6] [California Court of Appeal footnote 1:] Although Hill had changed the locks on the apartment in May of 1984, in August of 1984, [Petitioner] and Hill had a fight outside their accountant's office, and [Petitioner] had taken Hill's purse which contained her apartment keys.

3

had been shot in her house.
                        Ballistics analysis revealed that the bullets used to shoot Daniels were fired from
                either a Colt or a Moricu revolver of either a .38 special or a .357 magnum caliber. A
                box containing 12 rounds of .38 caliber bullets was found at [Petitioner's] residence.
                According to firearm registration records, several years previously, [Petitioner] had
                purchased two handguns, one of them a .38 caliber Colt revolver. [Petitioner] had
                purchased a gun when he had a restaurant business and carried the gun when he made
                bank deposits. [Petitioner] also had guns at the time he had the liquor store, and he
                periodically made bank deposits from the store.

(Pet. 216-22.) Because Petitioner challenges the denial of parole, the Court also reiterates the reasons

and basis for the Board's denial from the transcript of the Board hearing:

                        PRESIDING COMMISSIONER MARTINEZ: . . . Panel reviewed all the
                information received from the public and relied on the following circumstances in
                concluding that [Petitioner] is not suitable for parole and would pose an unreasonable
                risk of danger to society or threat to public safety if released from prison. [¶]
                We've come to these conclusions first by the commitment offense. The offense was
                carried out in a particularly cruel and callous manner. The offense was carried out in a
                manner which demonstrates an exceptionally callus [sic] disregard for human suffering.
                The motive for the crime was inexplicable and very trivial in relation to this offense.
                Again, these conclusions are drawn from the statement of fact[s] wherein [Petitioner] on
                August 30th, 1985, shot and killed Wayne Daniels, former boyfriend of ex-wife Rita
                Hill. Again, this was prior to [Petitioner] and Ms. Rita Hill being married and again,
                evidently . . . she had rekindled the relationship with Mr. Daniels. Again, the shooting
                occurred inside Ms. Rita's apartment. Eyewitnesses ID [Petitioner] as the shooter.
                [Petitioner], again, has denied involvement and states that he is not guilty of this crime.
                [¶]
                [Petitioner] has an escalating pattern of criminal conduct, indications of a stable social
                history, however, there are some minimal record of criminal record consisting of, again,
                a 484, PC 484 petty theft, which was dismissed due to insufficient evidence, and there
                was a conviction of making, passing fictitious checks, as well as a 1985 driving under
                the influence, again noted by [Petitioner's] own admission today. [¶]
                . . . You have participated in self-help, we feel these are recent in relationship to the total
                term of confinement that you have had. [¶]
                Concerning misconduct you have, again, only received 128 Counseling Chrono that was
                dated back to August 2nd of 1992, which was an out of bounds issue. You have no
                serious 115 disciplinaries issues, reports, correction. Psychological report dated for
                August 27 of 2005 authored by Dr. Schroeder is supportive. It does indicate that, again,
                his risk of harm to others is below average for parolee population and equal to the
                average citizen who has never been arrested. [¶]
                Regards to your parole plans, [Petitioner], you have viable residential plans in the last
                County of legal residence, you have acceptable employment plans, and you have
                marketable skills. There are no issues there in that area. [¶]
                Concerning the PC 3042 responses, the Deputy District Attorney from Los Angeles
                County is present and does oppose your parole suitability, as well as the Los Angeles
                County's Sheriff's Department that submitted a letter of opposition for your parole. [¶]
                The Panel makes the following findings: [Petitioner's] gains are recent; you must
                demonstrate an ability to maintain gains over an extended period of time. And again,
                we're noting that the programs essentially started in 2005 and 2006. [¶]
                Nevertheless, [Petitioner] should be commended for remaining disciplinary free
                throughout his incarceration. You have received two vocational trades, silk screening
                and graphic arts, but again, there is substantial amount of skills that you have from prior
                to your incarceration that you would go out and be able to utilize. I have a list of the self-

help that you've been involved in which consists of, mainly all of these aside from two, I believe, are all in 2006, again, listing 28 total starting January of '06 . . . . [¶]
 . . . You have numerous laudatory chronos, as well as good work chronos from supervisors as well.
 . . . .
      DEPUTY COMMISSIONER MITCHELL: . . . [O]ne of my greatest concerns is statements you made in your closing. You mentioned you're still in love with Rita. My comment to you, sir, is you need to get beyond her. If there's anything that makes you a risk, in my opinion, if you in fact committed this crime that I believe you did, would be the possible jealousy again in the future if she got involved in another relationship and she maybe involved in one. Just a suggestion to you, I think you would be wise to move on to a different relationship and leave Rita alone. If you still love her, I can see where it could be emotionally very trying on you. It might become a real problem if you're in the community and see her. . . . Maybe there's someone you can talk to about this because I think it would be unhealthy for your to have those feelings if you do have them.

(Pet. 135-39, 141, 142.)

**PETITIONER'S CLAIM**

Petitioner's rights under state law and the United States Constitution were violated when the Board denied him parole in 2006. (Pet. 4-5.)

**STANDARD OF REVIEW**

The current Petition was filed after the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), was signed into law and is thus subject to its provisions. *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997). The standard of review applicable to Petitioner's claims is set forth in 28 U.S.C. § 2254(d), as amended by the AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To determine what, if any, "clearly established" United States Supreme Court law exists, the court may examine decisions other than those of the United States Supreme Court. *LaJoie v. Thompson*, 217 F.3d 663, 669

n.6 (9th Cir. 2000). Ninth Circuit cases "may be persuasive." *Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000) (as amended). On the other hand, a state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law if no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court. *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Williams*, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8.

State court decisions which are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11 (*quoting* 28 U.S.C. § 2254(d)). Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *Williams*, 529 U.S. at 406-10, 413; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Woodford*, 537 U.S. at 24-25, 27. An "unreasonable application" is different from an "erroneous" or "incorrect" one. *Williams*, 529 U.S. at 409-10; *see also Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009); *Woodford*, 537 U.S. at 25.

A state court factual determination must be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in

habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

## DISCUSSION

Petitioner alleges his rights under state law and the United States Constitution were violated when the Board denied him parole in 2006. (Pet. 4-5.) Petitioner states the Board's finding of unsuitability for parole was based upon static and unchanging factors, and the Board failed to properly apply statutory, decisional, and regulatory law. (*Id.* 4.) Because the California Supreme Court summarily denied this claim, the Court must "look through" to the last reasoned decision, that of the Los Angeles County Superior Court on habeas review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). In rejecting Petitioner's claim, the superior court stated:

> The Court has read and considered [Petitioner's] Writ of Habeas Corpus filed on April 19, 2007. Having independently reviewed the record, giving extreme deference to the broad discretion of the Governor [sic, Board] in parole matters, the Court concludes that the record contains "some evidence" to support the Governor's [sic, Board's] finding that [Petitioner] is unsuitable for parole (Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 665 (hereafter *Rosenkrantz*).
> . . . .
> The Board found [Petitioner] unsuitable for parole after a parole consideration hearing held on October 12, 2006. Petitioner was denied parole for two years. The Board concluded that [Petitioner] was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.
> The Board can properly rely upon the circumstances of the crime in deciding that [Petitioner] is not presently suitable for parole. In this case, the Board found that the murder was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).) "This means that "the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of that offense." (*In re Scott* (supra) 119 Cal.App.4th 891.) An offense is more aggravated or violent when it involves severe trauma, "as where death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim." (*Id.* at 892.) Here, [Petitioner] inflicted multiple wounds with a gun, which did not result in immediate death, as evidenced by the fact that the victim's blood was found in areas away from the location of the body. Because of the callousness of the murder, the Board found that [Petitioner's] release would pose an unreasonable risk of danger to society.
> In addition to the circumstances surrounding the commitment offense, the Board was concerned that [Petitioner] continues to pose a risk of danger to his ex-wife. In his closing argument, [Petitioner] said, "Yes, I was wrong for the actions I took at the time, even though I was in love[]. [sic] I still love Rita now, and I love her at the end and I love her now." (*Reporter's Transcript*, October 12, 2006, p. 58.) The Board worried that his continued feelings for his ex-wife could be an issue for parole. Deputy Commissioner Mitchell stated, "If there's anything that makes you a risk in my opinion, if you in fact committed this crime that I believe you did, would be the possible jealousy again in the future if she got involved in another relationship and she may be involved in one. Just a suggestion to you, I think you would be wise to move on to a different relationship and

7

leave Rita alone." (*Id* at 70.) Although [Petitioner] has actively engaged in self-help programming for the last few years, the Board felt that until he gets over his feelings for his ex-wife and gains further insight into the nature and magnitude of the commitment offense, he still poses a risk of danger to her.

The Court finds that the Board's decision is supported by some evidence based on his stated concerns about the gravity of the commitment offense. As long as some evidence supports the decision, "the court is powerless to strike the balance of relevant factors differently, and powerless to declare that the inmate no longer poses a risk to public safety." (*In re Jacobson* (2007) WL2420675 at 7.) Here, the record reflects that there is some evidence that the commitment offense was carried out in a manner which demonstrates a callous disregard for human suffering. Additionally, there is some evidence to support the conclusion that [Petitioner] has not gained sufficient insight into the nature and magnitude of his offense due to his continued feeling for his ex-wife. (Cal. Code Regs., tit. 15, §2402, subd. (d)(3).) Because there is a factual basis for the reversal supported by some evidence in the record, this court may not "reassess the inference of future dangerousness to be drawn from the factual basis of the Governor's decision." (*Jacobson, supra*, at 7; see also *Rosenkrantz, supra*, 29 Cal.4th at pp. 676-677.)

Accordingly, the petition is denied.

(Answer Ex. B at 2-3.)

To the extent Petitioner contends that the Board and/or the Los Angeles County Superior Court violated state law, such a claim is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (stating a petitioner may not transform a state-law issue into a federal one by simply asserting a violation of due process).

### Current State of the Law

A federal due process claim is analyzed in two steps. *See Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127 (9th Cir. 2006). "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).

The Ninth Circuit has found it clearly established federal law that California "vests . . . California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (as amended) (citing *Bd. of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987); *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 12 (1979); *Sass*, 461 F.3d at 1128; *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion v. Duncan*, 306 F.3d 895, 903 (9th Cir. 2002)). A prisoner is entitled

to notice of the parole hearing, an opportunity to be heard, and if parole is denied, a statement of reasons for the denial. *See Greenholtz*, 442 U.S. at 16; *Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

The Ninth Circuit has also found that "the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' *Sass*, 461 F.3d at 1128-29 (citing *Superintendent v. Hill*, 472 U.S. 445, 457 (1985)); *see also Biggs*, 334 F.3d at 915 (citing *McQuillion*, 306 F.3d at 904), or is 'otherwise arbitrary,' *Hill*, 472 U.S. at 457." *Irons*, 505 F.3d at 851. "Additionally, the evidence underlying the board's decision must have some indicia of reliability." *McQuillion*, 306 F.3d at 904 (*quoting Jancsek*, 833 F.2d at 1390); *see Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam). The Supreme Court has elaborated the "some evidence" standard:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the . . . board. . . . The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.

*Hill*, 472 U.S. at 455-56 (citations omitted). When assessing whether a state parole board's suitability determination was supported by "some evidence" in a habeas case, the analysis is "framed by the statutes and regulations governing parole suitability determinations in the relevant state." *Irons*, 505 F.3d at 851 (*citing Biggs*, 334 F.3d at 915).

Thus, the Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851.

The Board's parole suitability decisions are governed by California Penal Code section 3041 and title 15, section 2402 of the California Code of Regulations. *See In re Lawrence*, 44 Cal. 4th 1181,

1201-02 (2008).[7] The Board "shall normally set a parole release date" one year prior to the inmate's minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." *Id.* at 1202; *see* Cal. Penal Code § 3041(a). A release date must be set "unless [the Board] determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." *Lawrence*, 44 Cal. 4th at 1202; *see* Cal. Penal Code § 3041(b).

Title 15, section 2402 of the California Code of Regulations is designed to guide the Board's assessment of whether the inmate poses "an unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. *Lawrence*, 44 Cal. 4th at 1202; *see* Cal. Code Regs. tit. 15, § 2402(a). "All relevant, reliable information available to the panel shall be considered in determining suitability for parole." Cal. Code Regs. tit. 15, § 2402(b). The regulation lists factors relating to suitability and unsuitability for parole. *See id.* § 2402(c), (d). The *Lawrence* court stated:

> [T]he core determination of "public safety" under the statute and corresponding regulations involves an assessment of an inmate's *current* dangerousness. . . . These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.
> . . . .
> [U]nder the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

*Lawrence*, 44 Cal. 4th at 1205-06, 1212.

"Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." *Id.* at 1212.

---

[7] The Court "must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole," *Irons*, 505 F.3d at 851, and accordingly utilizes *In re Lawrence* and *In re Shaputis*, 44 Cal. 4th 1241 (2008) as the latest California Supreme Court cases discussing parole suitability. *See Estelle*, 502 U.S. at 67-68 (stating a federal court is bound by a state court's construction of its own laws); *see also Bradshaw*, 546 U.S. at 76.

With regard to the Board's reliance solely on the commitment offense to deny parole, the *Lawrence* court held:

> [A]lthough the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

*Lawrence*, 44 Cal. 4th at 1214. The California Supreme Court then gave an example of when a prisoner's commitment offense could show present dangerousness:

> [C]ertain conviction offenses may be so "heinous, atrocious or cruel" that an inmate's due process rights would not be violated if he or she were to be denied parole on the basis that the gravity of the conviction offense establishes current dangerousness. In some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide "some evidence" of current dangerousness even decades after commission of the offense.
> . . . .
> [W]here the record also contains evidence demonstrating that the inmate lacks insight into his or her commitment offense or previous acts of violence, even after rehabilitative programming tailored to addressing the issues that led to commission of the offense, the aggravated circumstances of the crime reliably may continue to predict current dangerousness even after many years of incarceration.

*Lawrence*, 44 Cal. 4th at 1228;[8] *see also In re Shaputis*, 44 Cal. 4th 1241 (2008).

## Analysis

Applying the aforementioned framework, some evidence in the record supports the Board's finding that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society and a threat to the public safety if released from prison. *Hill*, 472 U.S. at 455-56; *Irons*, 505 F.3d

---

[8] With regard to a parole board's denial based solely on the commitment offense, the Ninth Circuit has stated, in a decision rendered *before Lawrence*'s clarification, that:
> [I]n all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in *Biggs*, *Sass*, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. *Biggs*, 334 F.3d at 912; *Sass*, 461 F.3d at 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

*Irons*, 505 F.3d at 853-54.

at 851; *Lawrence*, 44 Cal. 4th at 1205-06, 1212. The Los Angeles County Superior Court stated that the following reasons in the Board's denial of parole found support in the record: 1) the circumstances of the commitment offense; and 2) Petitioner continues to pose a risk of danger to his ex-wife. (Answer Ex. B at 3.)

As stated by the Board, the murder "was carried out in a particularly cruel and callous manner" and "in a manner which demonstrates an exceptionally callus [sic] disregard for human suffering." (Pet. 135); *see* Cal. Code Regs. tit. 15, § 2402(c)(1)(D). In addition, the Board stated that the motive for the crime was inexplicable or very trivial in relation to the offense. (Pet. 135); *see* Cal. Code Regs. tit. 15, § 2402(c)(1)(E). These factors of unsuitability for parole are supported by the facts of the commitment offense recited by the Board and Petitioner's conviction. *See supra* Factual Background; 28 U.S.C. § 2254(e)(1).

The risk of danger to Petitioner's ex-wife is also supported by the record, as evidenced by Petitioner's closing statement and Deputy Commissioner Mitchell's stated concern:

> [Petitioner:] . . . As you mentioned before this is not the forum to discuss any allegations that were made by Rita, they are allegations and that's supported by the facts that they're allegations. After 20 years being incarcerated I'm not going to sit here and say that I try to remember I did say this, I didn't do that. Rita and I were going through a very heated divorce. Was I wrong? Yes, I was wrong for the actions that I took at the time, even though I had been in love, *I still love Rita now, and I love her at the end and I love her now.* We were in the conflict and without having the adequate knowledge, people in the middle of a conflict have no control over their anger, they don't have the knowledge to reevaluate what should be done, what should be said, what is abusive, what is not abusive.
> . . . .
> DEPUTY COMMISSIONER MITCHELL: . . . . [O]ne of my greatest concerns is statements you made in your closing. You mentioned you're still in love with Rita. My comment to you, sir, is you need to get beyond her. *If there's anything that makes you a risk, in my opinion, if you in fact committed this crime that I believe you did, would be the possible jealousy again in the future if she got involved in another relationship and she maybe involved in one.* Just a suggestion to you, I think you would be wise to move on to a different relationship and leave Rita alone. If you still love her, I can see where it could be emotionally very trying on you. It might become a real problem if you're in the community and see her. . . . Maybe there's someone you can talk to about this because I think it would be unhealthy for your to have those feelings if you do have them.

(Pet. 129, 141, 142 (emphasis added)); *see* Cal. Code Regs. tit. 15, § 2402(b) ("Information Considered[:] All relevant, reliable information available to the panel shall be considered in determining suitability for parole."). Petitioner's allegation that his ex-wife died in January 2007 (*see* Pet. 44) and that this demonstrates he no longer poses a risk of danger to her does not alter the Court's analysis

because this allegation, if true, happened *after* the October 12, 2006, parole denial.

In consideration of the aforementioned circumstances, the Los Angeles County Superior Court had "some evidence," consistent with *Hill*, 472 U.S. at 454, to conclude that Petitioner constitutes a current threat to public safety as articulated in *Lawrence*, 44 Cal. 4th at 1212, and in the California statutes and regulations defining parole suitability, based on the gravity of the commitment offense and the danger presented to Petitioner's ex-wife. *See Irons*, 505 F.3d at 851.[9]

Accordingly, the Court finds that the California courts' rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Thus, habeas relief is not warranted on this claim.

## Certificate of Appealability

Because Petitioner challenges the denial of parole, a certificate of appealability is not required. *See* 28 U.S.C. § 2253(c)(1)(A); *Rosas*, 428 F.3d at 1231-32 (finding habeas petitioner was not required to obtain certificate of appealability where "target" of his challenge was not state court judgment or sentence but state Board's administrative decision to deny parole).

## CONCLUSION AND ORDER

For the reasons discussed above, the Court DENIES the Petition for Writ of Habeas Corpus with prejudice. The Clerk of Court is ORDERED to enter Judgment for Respondent and to close Case No. CV F 08-00364 LJO WMW HC.

IT IS SO ORDERED.

**Dated:    April 27, 2009**               /s/ Lawrence J. O'Neill
                                           UNITED STATES DISTRICT JUDGE

---

[9] The Court also notes that Petitioner, beginning his twenty-five years to life sentence in 1987, did not serve the minimum term of his sentence as of the 2006 Board denial of parole. *See Irons*, 505 F.3d at 853-54 ("All we held in those cases [*Sass*, *Biggs*] and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."); *supra* note 8.